## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM CUNNINGHAM,
*Plaintiff*,

v.

STAMFORD HEALTH MEDICAL GROUP, INC.,

*Defendant*.

No. 3:22-cv-01005-MPS

## RULING ON MOTION TO DISMISS

### I.     INTRODUCTION

William Cunningham claims that Stamford Health Medical Group, Inc. (SHMG),

wrongfully terminated his employment in violation of both public policy and his right to free

speech, which a Connecticut statute allows him to assert against SHMG even though it is a

private sector employer.  Because the operative complaint does not plead facts that make either

claim plausible, I GRANT SHMG's motion to dismiss under Fed. R. Civ. P. 12(b)(6).

### II.    FACTUAL BACKGROUND[1]

SHMG hired Cunningham as Executive Director of Revenue Cycle on March 27, 2017.

Amended Complaint, *ECF No*. 23 ¶¶ 3, 5. During his tenure, Cunningham performed "in a

satisfactory manner" and helped the company improve its collections of accounts receivable

according to several metrics.  *Id.* ¶P 5, 6-21.  On November 4, 2019, SHMG hired Jonathan

Immordino as Chief Financial Officer and "[t]hereafter, [t]hings [t]ook a [t]urn for the [w]orse."

*Id.* at p. 8, Heading (b).  Immordino was Cunningham's boss.  *Id.* ¶ 26.

On January 10, 2020, Immordino presented to Cunningham a document titled

Opportunities dated December 27, 2019.  *ECF No.* 23 ¶ 27.  Cunningham told Immordino that he

---

[1] Unless otherwise noted, I took the following facts from the amended complaint (ECF No.23) and accept them as
true for the purposes of resolving SHMG's Motion to Dismiss (ECF No. 27).

"did not agree with the content" and that "[t]here had been considerable progress and ongoing strategy around each of the opportunities over the last 18 months – 2 years." *Id.* ¶ 28. On January 13, 2020, Cunningham met with Immordino and expressed concerns about the document. *Id.* ¶ 29. "Immordino promised that by no means was the document meant to represent a vehicle for pushing Cunningham out." *Id.*

"[A]round this same time," Cunningham witnessed Immordino emerge from a private meeting with Howard Lasner, a revenue cycle manager with whom Immordino had worked at a previous employer. *Id.* ¶ 30. Cunningham asked Lasner what they had discussed but he refused to reveal any details. *Id.* Then, Cunningham overheard a conversation between Immordino and a consulting group, much of which "was derog[atory]" about "the status of the revenue cycle and, specifically, Cunningham's management style." When Cunningham confronted Immordino about these "false accusations," Immordino "deflected and was extremely dismissive." *Id.* ¶ 31.

On January 27, 2020, Immordino gave Cunningham a 90-day Performance Improvement Plan (PIP) dated "retroactively to" January 10, 2020. *ECF No.* 23 ¶ 32. Cunningham explained that he did not agree with the content and asserted that the date should not be retroactive. *Id.* He argued that he should have until May 10, 2020, to meet the expectations set forth in the PIP. *Id.* ¶ 33. Immordino was again dismissive. *Id.* On January 30, 2020, Immordino met with Cunningham to discuss the document. Cunningham reiterated his concern about the date and raised concerns about the language on the signature page. *Id.* ¶ 34. He gave an edited copy of the PIP to Immordino. *Id.* Cunningham also stated that "it . . . seemed as though Immordino['s] intent was to eventually terminate him – despite the progress he had made . . . and the headwinds he had faced." *Id.* ¶ 34. The following day, Cunningham found a new version of the PIP on his chair. *Id.* ¶ 35. The new version did not incorporate the majority of the changes that

Cunningham had suggested. *Id.* One suggested edit, a metric, had been adopted. *Id.* Around 1:00 p.m. that same day, Immordino came to Cunningham's office "irate" and expressed his disappointment that Cunningham had not yet signed the PIP in "a raised voice, punctuated tone and contentious language," *Id.* ¶ 36, 37. Cunningham felt threatened and alarmed, but reiterated his concerns and asked if he could speak with Human Resources "as Immordino [had] insinuated that Human Resources played a role in the crafting of the document." *Id.* ¶ 37, 38.  Immordino said that he was leaving for vacation "within the hour and wanted Cunningham's signature before he left." *Id*. ¶ 39.

After meeting with Immordino, Cunningham spoke with Tricia Golden, Senior Human Resources Partner. *ECF No. 23* ¶ 40.  Cunningham complained about the language and date in the PIP.  Golden explained that the language was standard and referred Cunningham back to Immordino about the date. *Id.* ¶¶ 41, 58. Golden also said she wished Immordino had not told Cunningham that "HR was vital in the decision surrounding the document," and said she would reach out to Immordino about this but never did so. *Id.* ¶¶ 42, 44.

On February 10, 2020, Immordino came to Cunningham's office at 6:00 p.m. and was verbally aggressive, bullying, and harassing, as he accused Cunningham of stalling. *ECF No. 23* ¶¶ 46, 48. Cunningham, who "felt threatened and alarmed," told Immordino that Human Resources was supposed to contact him and reiterated his wholehearted disagreement with the content of the PIP. *Id.* ¶¶ 48, 50. Immordino said there would be no changes to the document and became "more aggressive and harsher" in tone. *Id.* ¶ 50. On February 11, 2020, Cunningham signed the document. *Id.* ¶ 51.

On February 12, 2020, Immordino came to Cunningham's office and "berated him for a second time." *Id.* ¶ 52.  Cunningham felt threatened and saw Immordino's behavior as a part of a

culture of workplace bullying and harassment that threatened not only him but all other employees of SHMG.  *Id.* ¶ 55.  "As a result, staff, inclusive of [Cunningham] were afraid." *Id.* On February 14, 2020, Cunningham complained to Golden "about the inappropriate harassment and bullying campaign conducted by Immordino in the workplace." *Id.* ¶ 56.  Golden "suggested that Cunningham take the document to his 1-on-1 that afternoon to discuss the progress made on each of the items in the document."  *Id.* ¶ 58.  Human Resources did not conduct "any investigations into Cunningham's good-faith complaints." *Id.* ¶ 60.

During the next few weeks, Cunningham was excluded from an impromptu meeting with the Coding Manager and noticed that Lasner was emailing Immordino and concealing his email as Cunningham approached him.  *Id*. ¶ 61.  Once the COVID-19 pandemic hit, Cunningham's bi-weekly, 1-on-1 meetings with Immordino were often canceled.  *Id*. ¶ 62.  Immordino did not review the PIP or provide feedback as to how Cunningham was performing.  *Id.* ¶ 64.  During this time, there was an occasion on which Immordino became "aggressive and disrespectful," and Cunningham counts this as a third incident in which he felt threatened and "concerned about [the] impact [of Immordino's behavior] on the culture of SHMG as a whole." *Id.* ¶¶ 65-66.  In mid-March, Immordino opened Cunningham's office door while he was on a conference call, and screamed "in front of several staff members" for Cunningham to produce the names of the staff that he wished to furlough.  *Id.* ¶ 67.  Cunningham was embarrassed and counts this as a fourth incident of hostility, and alleges that "[m]uch of the office heard [Immordino] yelling." *Id.* ¶ 68. Cunningham again felt threatened.  *Id.* ¶ 69.

On April 10, 2020, there was no update from Immordino or HR regarding the PIP, but on June 8, 2020, Immordino told Cunningham that HR would like to discuss the PIP.  *Id.* ¶ 70.  On June 17, 2020, during a 1-on-1 meeting, Immordino gave Cunningham the PIP modified by

Immordino's appraisal of Cunningham's performance and a new end date of July 10, 2020. *Id.* ¶¶ 71, 73. The PIP was discouraging and contained several falsities, and Cunningham shared his proof of the falsities with Immordino and HR Director Evena Williams. *Id.* ¶ 72. Cunningham alleges that the July 10, 2020 end date, which then was only three weeks away, was "a setup for failure" and was designed to facilitate his termination. *Id.* ¶ 73. Cunningham signed the PIP "under extreme duress," attaching his proof that the content contained falsities and provided a copy to Williams. *Id.* ¶ 74.

In the week before his termination, Immordino referred to the comments that Cunningham had made on the PIP as combative. *Id.* ¶ 75. Cunningham responded he was "very distressed about his appraisal" and said that Immordino's comments were "complete fabrications." *Id.* ¶ 76. Cunningham also became aware that Immordino, Lasner, and Maritza Argudo (Assistant Manager, Ancillary Operations) were emailing each other about a "Bad Debt file" that Cunningham had allegedly created. *Id.* ¶ 77. Cunningham was unable to refute any of the allegations related to this file. *Id.* On July 8, 2020, Cunningham was terminated "under the guise of" performance. *Id.* ¶ 78.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting Ashcroft, 556 U.S. at 678 (citations and internal quotation marks omitted)). The Court must accept the well-pleaded factual allegations of the

complaint as true and draw all reasonable inferences in the plaintiff's favor.  See *Warren v. Colvin*, 744 F.3d 841, 843 (2d Cir. 2014). The Court must then determine whether those allegations "plausibly give rise to an entitlement to relief." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010).

## IV. DISCUSSION

### A. Count One: Wrongful Discharge in Violation of Public Policy

"As a general matter, employment relationships in Connecticut are 'at-will' absent a contract to the contrary." *Van Kruiningen v. Plan B, LLC*, 485 F. Supp. 2d 92, 95 (D. Conn. 2007).  Connecticut recognizes a common law exception to at-will employment only "if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." *Lopez v. Burris Logistics Co.*, 952 F. Supp. 2d 396, 404 (D. Conn. 2013) (emphasis in original).  The public policy exception is "a narrow one," *Parsons v. United Tech. Corp.*, 243 Conn. 66, 79 (1998), and "courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation," *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 477 (1980). When a court evaluates claims of wrongful discharge in violation of public policy, it "look[s] to see whether the plaintiff has alleged that his discharge violated any explicit statutory or constitutional provision or whether he alleged that his dismissal contravened any judicially conceived notion of public policy." *Thibodeau v. Design Grp.  One Architects, LLC*, 260 Conn. 691, 699 (2002) (internal emphasis omitted).  Claims of wrongful discharge are often rejected where there is "no statutorily based expression of public policy sufficient to warrant an exception to the at-will employment doctrine."  *Id.* at 701; *see also Geysen v. Securitas Sec. Servs.*, 322

Conn. 385, 408 (2016) ("[W]e have rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy.")

In count one of the amended complaint, Cunningham claims that his discharge "violat[ed] an important public policy of Connecticut, insofar as the termination was causally related to . . . [his reports of] ethical violations and issues of workplace bullying across the company as a whole." ECF No. 23 ¶ 86. SHMG argues that count one should be dismissed because Cunningham has failed to plead facts suggesting that his termination violated any important public policy. *ECF No. 27* at 5.

In his brief opposing the Motion to Dismiss, Cunningham, for the first time, invokes Section 31-49 of the Connecticut General Statutes, which provides:

> It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work, and fit and competent persons as his co-laborers and to exercise reasonable care in the appointment or designation of a vice-principal and to appoint as such vice-principal a fit and competent person. The default of a vice-principal in the performance of any duty imposed by law on the master shall be the default of the master.

Conn. Gen. Stat. § 31-49. Cunningham argues that SHMG failed to provide "fit and competent co-laborers," "in the person of [ ]Golden, and failed to exercise reasonable care in the appointment or designation of his supervisor," Immordino. *ECF No.* 29 at 5. As SHMG points out, however, the amended complaint itself makes no specific allegations about the fitness or competence of Golden and does not accuse SHMG of failing to exercise reasonable care in hiring Immordino. A party may not raise a new claim such as this one for the first time in a brief opposing a motion to dismiss. *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n.11 (S.D.N.Y. Sept. 30, 2021) ("it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.").

But even assuming that this theory of liability was adequately alleged, I would find it to be unsupported and implausible based on Cunningham's factual allegations. Connecticut law "expresses a clear and defined public policy requiring an employer ... to provide a reasonably safe workplace to its employees." *Parsons v. United Technologies Corp.*, 243 Conn. 66, 79 (1997). In *Parsons*, the court noted that Connecticut General Statutes § 31–49 "reflect[s] a broad legislative concern for the physical welfare and safety of Connecticut employees" and concluded that Connecticut employees may bring "a cause of action for wrongful discharge against an employer ... if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious harm that are not contemplated within the scope of the employee's duties." *Id.* at 80.

I agree with SHMG that Cunningham's allegations do not implicate the public policy of Section 31-49 and that he has not alleged a discharge for "refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm . . ." *ECF No.*30 ¶ 4 (citing *Parsons* at 80). Cunningham describes elevated voices and aggressive body language. But courts have generally limited Section 31-49 policy violations to physical harm or at least, serious threats of physical harm. *See Matyka v. Town of Hebron*, 2022 WL 18049306, at *2 (Conn. Super. Ct. Dec. 28, 2022) (Plaintiff alleged that he was specifically threatened with serious physical harm after a pattern of mistreatment at work); *Maggipinto v. Ulbrich Stainless Steels & Special Metals, Inc.*, 2017 WL 2111 *2 (Conn. Super. Ct. April 20, 2017) (Where defendant "solicited to exchange fisticuffs with [plaintiff], shoved [plaintiff], and forcefully snatched objects from [plaintiff's] grip," the court found an objectively substantial risk of serious bodily injury); and *Anderson v. United Way, Inc.*, 2011 WL 7272445, at *3 (Conn. Super. Ct. Dec. 27,

2011) (hate letter referencing "getting rid of African-American employees" violated requirement for employer to provide safe environment).

Cunningham alleges that Immordino conversed with him in a "verbally aggressive, outwardly bullying, and harassing" manner (*ECF No. 23* ¶ 46), went to his office and berated him" (*id.* ¶ 52), became openly aggressive and disrespectful (*id.* ¶ 65), and screamed at him in front of several members of his staff while he was facilitating a conference call. *Id.* ¶ 67. Nowhere in the amended complaint does Cunningham allege that Immordino physically harmed him or threatened him or anyone else with physical harm.

Cunningham's allegations fall short of alleging a public policy violation, and SHMG's motion to dismiss count one of the amended complaint must be granted.

### B. Count Two: Violation of Conn. Gen. Stat. § 31-51q

Count two of the amended complaint alleges a claim under Conn. Gen. Stat. § 31-51q, which makes an employer liable to an employee who was disciplined or discharged "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or sections 3, 4, or 14 of article first of the [Connecticut Constitution]." Conn. Gen. Stat. § 31–51q. Cunningham claims that he was exercising his free speech on matters of public concern with respect to workplace bullying and that, by virtue of Section 31-51q, this speech was protected by the First Amendment of the United States Constitution and Sections, 3, 4, and 14 of the Connecticut Constitution. *ECF No. 23* ¶ 89. SHMG moved to dismiss count two because it argues Cunningham spoke as an employee on a personal matter and his speech was not constitutionally protected. *ECF No. 27* ¶ 8.

Count two invokes both the First Amendment of the United States Constitution and Sections, 3, 4, and 14 of the Connecticut Constitution in support of the Section 31-51q claim.

Because these two provisions provide somewhat different levels of protection to employee speech, I address them separately below.

### 1.    First Amendment

Determining whether the First Amendment insulates Cunningham's alleged speech from employer discipline or other adverse action "requires determining whether [he] spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (internal citations omitted). "In *Garcetti,* the Court parsed [this inquiry] into separate questions as to (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011).  With regard to the first question, "[w]hether speech is on a matter of public concern … is to be answered by the court after examining the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *see also Pickering v. Bd. Of Ed.*, 391 U.S. 563 (1968).  With regard to the second, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.  Thus, an employer's decision to restrict *Garcetti* that stems from "a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen," and is therefore permissible. *Id.* at 421-22.  In determining whether an individual spoke as a citizen, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397–98 (2d Cir. 2018) (internal quotation marks omitted).  Because Cunningham's allegations make clear that he spoke as an employee and not a citizen, I conclude that he has failed to state a claim

under Section 31-51q based on the First Amendment and do not reach the first inquiry, i.e., whether the subject of his speech was a matter of public concern.

Cunningham alleges that "was exercising his free speech on matters of public concern with respect to workplace bullying."  ECF No. 23 ¶ 89.  This appears to be a reference to his allegation that on February 14, 2020, he complained to Golden in human resources about "the inappropriate harassment and bullying campaign conducted by Immordino in the workplace." Id. ¶ 56.  "Under the First Amendment, speech can be pursuant to a[n] . . . employee's official job duties [and thus not a basis for a retaliation claim] even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).  In *Weintraub*, the Second Circuit found that *Garcetti* barred a public school teacher's claim that his termination constituted First Amendment retaliation for his filing of a grievance about the assistant principal's failure to discipline a student who threw books in the classroom.  "Weintraub's grievance was pursuant to his official duties because it was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher – namely, to maintainclassroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id.* (internal citation and quotation omitted).  The court also relied on the fact that the teacher's "speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.*

As SHMG notes, Cunningham made his complaint "through a channel only available to him as an SHMG employee, i.e., Human Resources."  ECF No. 27 at 10.  Cunningham makes no allegations suggesting that he complained to anyone outside SHMG.  As in *Weintraub*, then, his use of an employer-sponsored channel for complaining about workplace behavior suggests he

was speaking as an employee, not as a citizen.  Further, his complaint to Human Reserouces about Immordino's alleged workplace bullying reflected his "concerns about his ability to properly execute his duties," *id.*, to do his job without interference from Immordino's bullying. Like Cunningham, who alleges that felt "threatened and alarmed" by Immordino's raising his voice and suffered "stress" as a result of Immordino's conduct (ECF No. 23 at ¶¶ 37, 54, 94), the teacher in Weintraub alleged that "it is not an environment a teacher would want to go to where a child is allowed to throw a book at teachers." *Weintraub*, 593 F.3d at 199.  Both complaints expressed concern about the impact of work conditions on the employee's ability to work.

Cunningham's allegations that he was concerned not just for himself but for his co-workers do not change the analysis for two reasons.  First, Cunningham does not actually allege that he complained to Human Resources that Immordino was bullying any co-workers or that Immordino's conduct was placing any co-workers at risk.  He alleges only that he "saw" Immordino's behavior "as a threat not only to himself, but to those around him," that he was "concerned that Immordino's behavior constituted part of a culture of workplace bullying … that threatened … all … employees of SHMG," and that he was "specifically concerned with the impact of Immordino's behavior … on the organization as a whole, and on all employees of SHMG." ECF No. 23 ¶ 54, 55, 57. He does not allege that his speech – that is, his complaints to Human Resources – related to anyone other than himself. [2]   Second, even if he had made such an allegation, it would make no difference to the *Garcetti* analysis: the teacher in *Weintraub,* too, was also concerned about others, i.e., he was "concerned that if this child could do this to Weintraub, it would put the other students at risk."  593 F.3d at 199 (internal quotation marks

---

[2] Cunningham also makes a conclusory allegation that "staff, inclusive of Plaintiff, were afraid," ECF No. 23 ¶ 55, but he does not allege any facts to support the notion that anyone other than himself was afraid.  Nor does he allege that any other employees were bullied, berated, "screamed" at, or harassed.

and alterations omitted).  This did not dissuade the Second Circuit from finding that he was speaking "pursuant to his official duties as a schoolteacher," 593 F.3d at 205, rather than as a citizen.

Cunningham does not address whether he spoke as a citizen or as an employee, making no mention of *Garcetti* in his brief.  He discusses only the first inquiry, whether the subject of his speech was a matter of public concern.  See ECF No. 29 at 8-11.  Failure to brief an issue raised in an opposing party's motion to dismiss is "grounds to deem the claim abandoned."  *See, e.g., Lami v. Stahl*, 2007 WL 3124834 *1 (D. Conn. Oct. 25, 2007).  In any event, I conclude that Cunningham's allegations make clear that he spoke as an employee, rather than a citizen, and so he has failed to allege any speech that would insulate him from employer discipline or other adverse action under the First Amendment.

Because I have concluded that Cunningham's only federal-law claim fails, I may decline to exercise supplemental jurisdiction over his remaining state-law claim, i.e., his claim that SHMG violated Section 31-51q because his speech was protected by the Connecticut Constitution.  28 U.S.C. § 1367(c)(3) (A district court "may decline to exercise supplemental jurisdiction over [state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction."). Nonetheless, I will address the Connecticut constitutional claim under Section 31-51q because it is entwined with the First Amendment claim.

### 2. Connecticut Constitution

The Connecticut Supreme Court has held that the *Garcetti* framework, discussed above in relation to the First Amendment, does not apply to claims arising under the state constitutional provisions referred to in Section 31-51q because, among other reasons, "precedent favors a broader reading of the free speech provisions of the state constitution than of the first

amendment." *Truz v. UBS Realty Inv'rs, LLC*, 319 Conn. 175, 205 (Conn. 2015). *Trusz* adopted a

"modified" version of the *Pickering/Connick* "matter of public concern" test for claims brought

under Section 31-51q based on the Connecticut Constitution by employees who speak as

employees, i.e., pursuant to their official duties: "It is only when the employee's speech is on a

matter of public concern *and* implicates an employer's official dishonesty ... other serious

wrongdoing, or threats to health and safety that the speech trumps the employer's right to control

its own employees and policies." *Id*. at 212 (internal quotation marks and citation omitted;

emphasis added).

Although his brief does not discuss the *Trusz* test, Cunningham argues that his complaint

about Immordino's bullying involved workplace "safety." ECF No. 29 at 8-12.  Cunningham

cites no cases suggesting, however, that complaints about a supervisor's "irate" or "aggressive"

manner, "disrespectful" tone, "raised voice," "contentious language," and even "berat[ing]" a

subordinate and "screaming" so that other office workers could hear, ECF No. 23 at ¶¶ 36, 37,

53, 66, 67, 68, amount to speech implicating "threats to health and safety."[3] And the "workplace

safety" cases he cites are far afield from the facts of this case. *McClain v. Pfizer, Inc.*, 2011 WL

3533670 *2 (D. Conn. June 27, 2011) involved an employee's complaints about odors coming

from a lab at a pharmaceutical company and the placement of "desks near laboratory benches

where experiments were performed," which the Court found to be about "safety in the

workplace" and thus "a matter of public concern" under the traditional *Pickering/Connick* test,

rather than the *Trusz* test for determining whether the Connecticut Constitution insulates

employees from discipline for speech by them as part of their jobs.  *Munafo v. Mentropolitan*

*Transp. Authority*, 285 F.3d 201 (2d Cir. 2002) similarly found that complaints by a maintenance

---

[3] Cunningham does not suggest that his complaints to Human Resources raised any issues of "official dishonesty" or "serious wrongdoing," and because it does not appear that they did, I do not address any such issues.

worker about "trackworkers' being forced to operate in unlawful proximity to live rails without protective gear, welders' being forced to work without respirators, and drivers' being assigned vehicles with faulty brakes," *id.* at 212, satisfied the *Pickering/Connick* matter of public concern standard.  Apart from applying a different legal standard, these cases, involving the real possibility of physical harm to employees and the public, are a far cry from the allegations in this case, even when those allegations are construed in the light most favorable to Cunningham.  *See also Lowe v. AmeriGas, Inc*., 52 F.Supp.2d 349, 359 (D. Conn. 1999) (holding that employee's complaints about customer service, employee attitudes, racial remarks by other employees, inventory control problems and training "were not matters of public concern," while his complaints about "safety concerns regarding the improper storage of a hazardous substance such as propane" did "implicate matters of public concern").[4]  Cunningham makes no allegations that Immordino engaged in violence or threats of violence and alleges no facts suggesting that Immordino's conduct went beyond rudeness and an overbearing manner.  Further, as noted, although he alleges he was "concerned" about not just himself but his co-workers as well, he alleges no facts suggesting that Immordino's obnoxious behavior was addressed to anyone other than himself; nowhere does he suggest that Immordino "bullied" any other employees.  I find it unlikely that loud, angry, or disrespectful comments by a supervisor to a subordinate are what

---

[4] In *Thibault v. Spino*, 431 F. Supp.3d 1, 10-11 (D. Conn. 2019), the court stated that "[b]ullying is a subject of public interest," and found that a school bus driver could maintain a First Amendment retaliation claim against a school board after she was fired following her posting of a Facebook message in which she had accused a member of the school board, who was also running for a seat in the Connecticut General Assembly, of failing to curtail school bullying by her children.  The bus driver had posted the message publicly on the Facebook page of the campaign of the candidate who was opposing the school board member in the campaign for the General Assembly seat.  Appling the traditional *Pickering/Connick* test to the First Amendment claim, the court found that the bus driver's message was speech on a matter of public concern: "Bullying is a subject of public interest, and the way a political candidate—particularly one who is a member of a school board—handles it when her own family is concerned can be said to bear on the candidate's character. " *Id.* at 10.  The *Thibault* case is obviously distinguishable, because it had nothing to do with "threats to health and safety" in the workplace or elsewhere, did not involve speech pursuant to the employee's duties, and did not apply the *Trusz* test for determining whether the Connecticut Constitution insulates from employer discipline the speech of an employee pursuant to the employee's duties.

the Connecticut Supreme Court had in mind when it referred in *Trusz* to "threats to health and safety." I therefore conclude that Cunningham's allegations do not describe a violation of Section 31-51q based on the Connecticut Constitution.

Accordingly, I grant SHMG's motion to dismiss count two.

## V.    CONCLUSION

For the reasons above, I GRANT the motion to dismiss (*ECF No.* 26).

IT IS SO ORDERED.

 /s/Michael P. Shea
Michael P. Shea, U.S.D.J.

Dated: July 27, 2023

Hartford, Connecticut

16